UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| ERIC L. TURNER,<br><br>Petitioner,<br><br>vs.<br><br>CAROLYN W. COLVIN, Commissioner of Social Security,<br><br>Respondent. | Case No. CV 1:14-CV-00016-REB<br><br>**MEMORANDUM DECISION AND ORDER.** |

Now pending before the Court is Petitioner Eric Turner's Petition for Review (Dkt. 2), filed on January 15, 2014, seeking review of the Social Security Administration's final decision to deny him disability benefits. This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully reviewed the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

## I. BACKGROUND AND ADMINISTRATIVE PROCEEDINGS

On June 7, 2011 Petitioner applied for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI"), alleging a disability onset date of August 15, 2009. (AR 10). The claim was initially denied on October 4, 2011, and also denied upon reconsideration on December 29, 2011 (*Id.*). The Petitioner thereafter requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 27, 2012. (*Id.*). ALJ John Arkoosh presided over the hearing, at which the Petitioner was present and represented by his attorney, Jessica Bublitz. A Medical Expert, Donna Veraldi, PhD, and a Vocational Expert, Kent

**MEMORANDUM DECISION AND ORDER - 1**

Granant, both gave testimony at the hearing, as did Petitioner himself. (*Id.*)

On December 10, 2012, the ALJ issued a decision, denying Petitioner's claims, finding that Petitioner was not disabled within the meaning of the Social Security Act. (AR 10-28). On or about December 21, 2012, Petitioner requested review from the Appeals Council. (5-6.) The Appeals Council then denied review on December 19, 2013, (AR 1-4), rendering the ALJ's decision the Commissioner's final decision. Plaintiff now seeks judicial review of the Commissioner's decision to deny benefits. Petitioner contends the ALJ erred by failing to accord proper weight to the opinion evidence in the file, and in particular, by disregarding the opinions of Petitioner's treating and examining medical providers in favor of those of a state agency consultant. (Petitioner's Brief at 1).

## II. STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. 42 U.S.C. § 405(g); *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005); *Flaten v. Sec'y of Health & Human Servs.*,

**MEMORANDUM DECISION AND ORDER - 2**

44 F.3d 1453, 1457 (9th Cir. 1995). The standard requires more than a scintilla but less than a preponderance of evidence, *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir.1975), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ. *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019. The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995); *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1989). The ALJ is also responsible for drawing inferences logically flowing from the evidence, *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). Where the evidence is susceptible to more than one rational interpretation in a disability proceeding, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error. *Matney*, 981 F.2d at 1019. The ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id*. However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

**MEMORANDUM DECISION AND ORDER - 3**

## III. DISCUSSION

### A. Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) - or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) - within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe her physical/mental impairments are and regardless of her age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that the claimant had engaged in SGA for part of the period for which disability benefits were sought, namely, from July 2012 through the date of the administrative hearing. However, the ALJ also found that claimant had *not* engaged in SGA during the time frame running from the date of the alleged disability onset until July of 2012. The remainder of the ALJ's findings addressed this period, as will the Court's. (AR 12-13).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration

**MEMORANDUM DECISION AND ORDER - 4**

requirement. 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521, 416.921. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Petitioner had the following severe impairments: gout, degenerative joint disease of the left knee, schizo-affective disorder with psychosis, and a history of substance abuse that had been in remission since August of 2010.[1] (AR 13.).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the ALJ concluded that Petitioner's physical limitations (gout and degenerative joint disease in the left

---

[1] Schizoaffective disorder is "a condition in which a person experiences a combination of schizophrenia symptoms–such as hallucinations or delusions–and mood disorder symptoms, such as mania or depression." *See,* http://www.mayoclinic.org/diseases-conditions/schizo-affective-disorder/basics/definition/con-20-029221.

**MEMORANDUM DECISION AND ORDER - 5**

knee) were either not severe enough to affect his ability to ambulate effectively, or flared only infrequently and were controlled with medication. (AR 13-14). The ALJ also found that Petitioner's mental impairment resulted in mild to moderate restrictions in the activities of daily living, and moderate difficulties in social functioning, concentrating, and persistence. The ALJ further concluded that Petitioner had not had any episodes of psychological decompensation since he attained sobriety in August of 2010. Accordingly, the ALJ determined that Petitioner's mental impairment, whether considered singly or in combination with his physical limitations, did not meet or equal a listed impairment. (AR 14-15). Only the ALJ's conclusions regarding Petitioner's mental limitations are at issue in this appeal.

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. §§ 404.1545, 416.945. Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. Here, the ALJ determined that physically, Petitioner retained the ability to perform at least sedentary work as defined in 20 CFR 404.1576(a) and 416.967(a), with some limitations on lifting. (AR 16). However, Petitioner's schizo-affective disorder limited him to "simple, routine, and repetitive tasks" that required only simple decision-making. (*Id.*). The ALJ also concluded that any job should require no more than occasional interaction with the

**MEMORANDUM DECISION AND ORDER - 6**

public, only occasional supervision or "critical checking" of his work, and no more than occasional changes in work routine. *(Id.).*

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). If the claimant is able to do other work, she is not disabled; if the claimant is not able to do other work and meets the duration requirement, she is disabled. The ALJ found, at step five, that Petitioner is capable of making a successful adjustment to work that exists in significant numbers in the national economy.  (AR 19-20).

**B.     Analysis**

Before turning to the specific assignment of error raised by Petitioner, a few general observations are in order. It is a truism in social security law that conditions that can be controlled with medication or other treatment are not considered disabling for purposes of determining eligibility for disability benefits. *See, e.g. Warre v. Commissioner of Soc. Sec. Admin,* 439 F.3d 1001, 1006 (9th Cir. 2006). In this case, the ALJ's conclusion that Petitioner was not disabled was predicated on exactly this notion, (AR 17), and the Court's own review of the medical evidence also shows that Petitioner's schizo-affective disorder, while clearly a serious condition, is well-controlled with treatment. When Petitioner does not get treatment for this condition, and in particular when he neglects to take the psycho-tropic medications that have been consistently prescribed for many years, he suffers from significant symptoms of psychosis,

**MEMORANDUM DECISION AND ORDER - 7**

to the point where, on occasion, he has demonstrated the potential to become a danger to himself and others. (AR 572-594). If, however, Petitioner remains compliant with the regimen of medication that has been prescribed to him over the past several years, his condition stabilizes, and his mental outlook and ability to function in a workplace setting improve dramatically.

Consistent with the ALJ's determinations, this Court's review of the evidence demonstrates that from the time of the onset of alleged disability in August of 2009 until about November of 2010, Petitioner was not taking his prescribed medications consistently. (AR 550, 555-56, 578, 484). As a result, his schizoaffective disorder on several occasions became significantly worse, as the medical records from two hospitalizations that occurred during the 2009-2010 time frame indicate. The first of these episodes was in October of 2009, when Petitioner voluntarily checked himself into the hospital for approximately two days. (AR 550-561). The second episode lasted from February 24 to March 2 of 2010 and was an involuntary commitment that apparently resulted when Petitioner became combative with his landlord and with police. (AR 572-594). The medical records indicate that at the time of the second hospitalization, Petitioner was having suicidal and homicidal ideation, and that he had to be sedated, placed under continuous observation, and placed in restraints. (AR 572-575). However, several days after the medications were restarted, treatment records describe Petitioner as being "pleasant and cooperative" and indicate that he was no longer producing significant delusional thoughts. (AR 587). Though these episodes were undoubtedly traumatic for Petitioner, the ALJ concluded that they were not of sufficient frequency or duration such that his schizoaffective disorder would meet or equal a listed impairment. (AR 21). Petitioner does not challenge this conclusion on appeal.

**MEMORANDUM DECISION AND ORDER - 8**

In August of 2010, Petitioner was jailed for several months on charges related to grand theft and possession of methamphetamine. Upon his release from incarceration in November of 2010, he was placed on probation, given a spot as a participant in a community Mental Health Court, and came under the regular care of a psychiatrist, Dr. Katherine Roman. He also began taking his medications consistently. After two or three months of treatment with Dr. Roman, Petitioner's condition had improved significantly. By the spring of 2012, it had improved to the point where he was able to obtain and hold down, albeit with some difficulty, a part time job as a cashier at a Maverick store–a job which actually required *more* in the way of public interaction than the jobs that the VE identified as appropriate for him.[2]  During this time, Petitioner was also living independently, managing to care for himself and to attend to his finances and the necessities of daily living. He was also able to remain compliant with the terms of his probation, which included participating in the requirements of Mental Health Court and abstaining from drugs and alcohol – achievements for which Petitioner deserves significant credit. However, this same evidence also supports the ALJ's conclusion that Petitioner's condition can be successfully managed with medication, and is therefore not disabling.

With this background in mind, the Court now turns to the specific allegation of error that Petitioner has ascribed to the ALJ's decision. Petitioner's sole argument on appeal is that the

---

[2] Specifically, Petitioner testified that he sometimes got so stressed out from work that he didn't want to do anything but lie in bed. (AR 79). However, he also testified that the stress was closely related to the aspects of his job that required public interaction, and that he felt capable of performing other work that did not require so much public interaction, such as janitorial work. (AR 76).  The jobs the VE identified as being a proper fit for someone with Petitioner's capabilities and limitations–dowel inspector, touch-up inspector, and semi-conductor bonder–were all sedentary positions that required only occasional interaction with the public. (AR 100-101).

**MEMORANDUM DECISION AND ORDER - 9**

ALJ erred by failing to accord proper weight to the opinions of his treating psychiatrist, Dr. Katherine Roman, and those of an examining psychologist, Dr. Ryan Hulbert, to whom Petitioner was referred for a mental status examination by the State of Idaho Disability Determination Services.

### 1.    Dr. Roman

Petitioner relies heavily on a Mental Impairment Questionnaire that Dr. Roman completed on February 6, 2012. In that questionnaire, Dr. Roman opined that Petitioner had "no useful ability to function" at numerous work-related tasks, including remembering work-like procedures, understanding, carrying out simple instructions, maintaining attendance and punctuality, sustaining routines, getting along with co-workers, dealing with ordinary work stress, and getting through an ordinary work day without experiencing psychologically compromising symptoms. (AR 761). In handwritten notes explaining her assessment, Dr. Roman wrote that, due to his schizo-affective disorder and bipolar disorder, "[Petitioner] has times that he is unable to function, gets paranoid, hears voices, and can't stand to be around people due to paranoia." (*Id.*). The Vocational Expert ("VE") acknowledged at the hearing before the ALJ that if Dr. Roman's assessment of Petitioner's limitations were accurate, it would rule out any possibility of sustaining gainful employment. (AR 99-100).

In Social Security cases, courts reviewing an ALJ's decision "employ a hierarchy of deference to medical opinions depending on the nature of the services provided." *Ryan v. Comm'r. of Soc. Sec. Admin,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citing standard in dissent); *See also, Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995). This hierarchy distinguishes among three types of physicians who may be involved with a social security claimant: those who treat the

**MEMORANDUM DECISION AND ORDER - 10**

claimant, those who examine the claimant but do not treat him, and those who neither examine nor treat but simply review the medical evidence prepared by others and provide opinions as to the presence or absence of functional limitations. Generally speaking, a treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Ryan,* 528 F.3d at 1204. If a treating doctor's opinion is not contradicted in the record by the opinion of another doctor, an ALJ may reject it only for clear and convincing reasons that are supported by substantial evidence in the record. *Id.* at 1198; *Lester,* 81 F.3d at 830. The ALJ must accord "controlling weight" to a treating doctor's opinion if medically approved, diagnostic techniques support the opinion and the opinion is not inconsistent with other substantial evidence in the record. *Ligenfelter v. Astrue,* 504 F.3d 1028, 1038 n.10 (9th Cir. 2007). This standard of deference to the opinions of treating doctors does not, however, require an ALJ to accept the opinion of any doctor, including a treating doctor, that is "brief, conclusory, and inadequately supported by clinical findings." *Chaudry v. Astrue*, 688 F.3d 661 (9th Cir. 2012). An ALJ may also properly reject opinions of treating physicians where they are wholly based on the claimant's self-reporting and not backed up by any objective medical findings. *Turner v. Comm'r. Soc. Sec.,* 613 F.3d 1217, 1222-24 (9th Cir. 2010); *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).

      Here, the ALJ's conclusion that "in no way does the evidence portray an individual of the critical impairment level set forth by Dr. Roman at Exhibit 18F," is fully supported by the evidence in the record. This is true whether one employs the "substantial evidence" test or the

**MEMORANDUM DECISION AND ORDER - 11**

"clear and convincing evidence" standard.[3]  While Dr. Roman's opinions in the February 6, 2012 Mental Impairment Questionnaire are not directly contradicted by the opinions of another provider, they are inconsistent, and strikingly so, with the rest of her treatment records. It is difficult to reconcile the extremely pessimistic picture of Petitioner's mental health that Dr. Roman depicted in the February 6, 2012 Mental Impairment Questionnaire with the overall much rosier picture of Petitioner's mental functioning that she describes in the records of her numerous visits with Petitioner during the eighteen- month period during which he was her patient. In short, while the Mental Impairment Questionnaire may have accurately depicted Petitioner's mental health on that particular day, the ALJ did not err by refusing to take that day as representative snapshot of Petitioner's overall level of mental functioning.

Petitioner began seeing Dr. Roman just after he was released from the Canyon County jail in November of 2010. During the first few weeks after his release from his jail, Petitioner's mental health status was very poor. During her first visit with Petitioner, which occurred on November 8, 2010, Dr. Roman noted that he was depressed, anxious, and was displaying some passive suicidal thoughts. During that visit, she also assigned him a Global Assessement Functioning Score ("GAF Score") of 45.[4]

---

[3] As far as the Court can tell, the Ninth Circuit has never clarified whether district courts reviewing an ALJ's decision should use the "substantial evidence" standard or the "clear and convincing evidence" standard where a provider's opinions are inconsistent with her *own* treatment records, as opposed to those of another doctor. While the Court is of the opinion that "substantial evidence" is the appropriate test to employ in those circumstances, here, the evidence easily satisfies either standard.

[4] A GAF score represent's a clinician's judgment as to a patient's overall level of psychological, social, and occupational functioning, without regard to any possible physical impairments. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000). A GAF score in the range of 41–50

Thereafter, Dr. Roman's records indicate that Petitioner continued to struggle for most of November, December, and January. During a clinic visit on November 22, 2010, Dr. Roman noted that he had been off his psychiatric medications since being released from jail, and had only recently started taking them again. (AR 674). On December 6, 2010, Petitioner apparently indicated to Dr. Roman that he felt like beating fists against wall so that physical pain would take away the mental pain. Dr. Roman assigned a GAF score of 46 on that day. (AR 672). On January 3, 2011 Dr. Roman indicated that Petitioner was still depressed, had been sleeping very little, and was having auditory hallucinations and possibly some visual hallucinations as well. (AR 670). Petitioner's GAF scores for the months of November, December and January were all below 50. (AR 670 to 674).

By February of 2011, however, Petitioner's mental status began to improve considerably. On February 14, 2011, he told Dr. Roman that he was doing much better. Dr. Roman indicated that he displayed "no psychotic symptoms" and that his insight and judgment were good. She described his schizo-affective disorder as being "currently stable" and his methamphetamine dependence in "early full remission." (AR 669). His GAF score for this day was approximately 55. (AR 669). On March 11, 2011, the picture had improved even more. Dr. Roman noted that Petitioner had told her he was doing "very well." Her notes also indicate, that "he [Petitioner] is quite embarrassed when our staff tells the judge that he is doing incredibly well." (AR 668). His GAF score on this day was 56. (*Id.*). Dr. Roman's records from the spring and summer of 2011

---

indicates serious symptoms or a serious impairment in social, occupational, or school functioning indicative of an individual who would be unable to keep a job. *Id*. In contrast, a GAF score in the range of 51–60 indicates only moderate symptoms or moderate difficulty in social, occupational, and school functioning, indicative of someone who may have few friends and some conflicts with peers or coworkers. DSM–IV, at 34.

**MEMORANDUM DECISION AND ORDER - 13**

indicate that Petitioner continued to do well during this time period, with GAF scores in the low to mid 50s. (AR 667, 769, 770). In August of 2011 Dr. Roman described him as "bright, euthymic and mentally sharp." (AR 770). In October of 2011 she again described him as stable. (AR 768).

During late fall of 2011 and winter of 2012, Petitioner reported increased feelings of depression and anxiety, as well as some passive suicidal thoughts and some hallucinations. (AR at 731, 765 - 768, & 797). Medical records indicate that this decrease in his mood during to this time frame was a related to an incident that occurred in his mental health classes and anxiety over completing the 9th Step of his AA treatment. (AR 731). On February 6, 2012, Petitioner reported to Dr. Roman that he was not doing very well at all, was not sleeping well, that he didn't want to be around people and was hearing voices and getting paranoid. He reported that he would do well for a while and then "plummet," and that the plummets would last three or four weeks, which made it difficult for him to hold down a job. (AR 797). It was on this day that Dr. Roman completed the Mental Impairment Questionnaire describing a near total inability to function in a workplace setting. (AR 758 to 763). Petitioner's GAF score on February 6, 2012 was 45. (AR 758).

Less than a month later, however, Petitioner's condition had improved significantly. On his March 5, 2012, he reported to Dr. Roman that the Trazodone she had prescribed had helped him sleep better and that his mood had improved as a consequence. (AR 796). In May and June of 2012 his GAF scores were back up to 55 and 58, respectively, and he had obtained the job as a cashier at a Maverick store. (AR 793 to 795). By late July of 2012 he was describing himself as "fairly stable," and reported that "life was a lot better than it was two years ago." (AR 796).

**MEMORANDUM DECISION AND ORDER - 14**

During the time that he was seeing Dr. Roman, Petitioner was also successfully complying with the terms of his probation and staying off of drugs and alcohol. (AR at 22). Though he did report struggling sometimes with the aspects of his cashier job that required public interaction, he nonetheless managed to hold this job down for at least several months, from June of 2012 until the time of the hearing before the ALJ in September of 2012. (AR at 58-59).

Seen in this context, Dr. Roman's Mental Health Impairment Questionnaire paints a picture of total non-functionality that is quite out of step with the rest of her treatment records. Though Petitioner's condition did take a downward slide in the winter of 2012, this episode resolved with treatment, to the point where several months later, he was able to find and maintain employment, was reporting that he was in a generally positive frame of mind, and had GAF scores above 50. In short, the record fully supports the ALJ's decision not to take Dr. Roman's opinions in the Mental Health Impairment Questionnaire as a representative picture of Petitioner's overall capabilities.

### B.     Dr. Hulbert.

Finally, the ALJ did not err in deciding to give little weight to the opinions of Dr. Hulbert, the psychologist who examined Petitioner at the Request of Idaho State Disability Determination Services. (AR 683-688). Dr. Hulbert saw Petitioner in September of 2011, at time when he had been in treatment with Dr. Roman for approximately ten months. After examining Petitioner, Dr. Hulbert remarked that his abilities in the areas of persistence and adaptability were "poor" and "very poor" in the area of social interaction. Dr. Hulbert also concluded that Petitioner's overall prospect for full time employment was "poor to fair." (AR 688). The ALJ elected to give limited weight to these opinions because they were inconsistent with the evidence in the record, including

**MEMORANDUM DECISION AND ORDER - 15**

the evidence indicating that during this time frame, Petitioner was living independently, socializing with friends, attending daily AA meetings, and complying with guidelines applicable to his probation and mental health court goals. (AR 20). The opinions were also inconsistent with Dr. Roman's treatment records from the same time period, which described Petitioner as "bright and euthymic" and his overall condition as "stable." (AR 768 & 770). And, while the ALJ did not note this particular discrepancy, Dr. Hulbert's records also indicate that Petitioner's GAF score in the past year had not exceeded 50, a conclusion that is completely at odds with Dr. Roman's records.

For all the foregoing reasons, the ALJ's conclusion that Petitioner's schizo-affective disorder was controllable with medication and therefore not disabling, is based on proper legal standards and supported by substantial evidence. Overall, the evidence supports the ALJ's conclusion that when Petitioner takes his prescribed medications, his condition remains relatively stable and is therefore not disabling. Accordingly, the Commissioner's decision is affirmed.

## IV.  ORDER

Based on the foregoing, Petitioner's Petitioner for Review (Dkt. 1) is **DENIED,** the decision of the Commissioner is **AFFIRMED,** and this action is **DISMISSED** in its entirety, with prejudice.

DATED:  **April 8, 2016**

_Ronald E. Bush_
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge